IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JANET L. FINTON,

        **Plaintiff,**

  v.                                            Civil Action 2:20-cv-4139
                                                   Judge Sarah D. Morrison
                                                   Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Janet L. Finton, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Hospital Insurance Benefits ("HIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff protectively filed her application for DIB on April 19, 2016, alleging her disability began on January 1, 2013. (Tr. 414–15). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on April 11, 2018. (Tr. 156–81). The ALJ issued a decision denying her benefits. (Tr. 221–40).

But, on March 14, 2019, the Appeals Council vacated the decision. (Tr. 241–46). Consequently, another hearing was held on September 6, 2019. (Tr. 49–72). Still, the ALJ came to the same conclusion and denied Plaintiff's applications for benefits. (Tr. 13–40). This time, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff then came to this Court, and the matter is ripe for review. (*See* Docs. 1, 11, 16, 17).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony:

> [Plaintiff] testified that she is unable to work due to pain from fibromyalgia, migraines, and symptoms of depression and anxiety. She stated that fibromyalgia makes her hurt for 2–3 hours when she wakes up, and specifically noted finger joint pain. She stated she has "fibro fog," is tired all the time, and that there are days that it hurts to get out of a chair. She noted "doing ice and heat," taking Aleve and Lyrica for her pain, which she stated does help. She reported migraine headaches daily, with 10–12 days per month where she cannot have any exposure to sunlight or drink anything. Prior to 2017, [Plaintiff] endorse[d] migraine headaches of 3–4 per week, with vomiting on occasion. She noted a history of Botox injections with 14 days of no migraine headaches after a treatment and can get them every eight weeks. [Plaintiff] testified that she was switched from pain medication to medical marijuana, and indicated that it helps immensely. She stated she has difficulty with focus and needs to stand up during the day, and that she historically has had more bad days than good days, in terms of being able to get things done.
>
> She reported providing care for her husband, specifically making sure he takes nutrition and hydration, making a plant based diet for him, and making him comfortable. She noted that she cooked meals, and did light cleaning although currently she has assistance from a cleaning lady. She endorsed engaging in yoga and exercise, and had historically visited the gym 3–4 days per week. However, she stated that due to her husband's illness, she is unable to maintain that gym schedule.

(Tr. 23).

### B. Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms related to her physical impairments, beginning with her history of fibromyalgia, headaches, and chronic pain from 2012–2014:

> Review of the record reveals a history of fibromyalgia, as well as headaches and pain symptoms exacerbated by a fall down some stairs in 2012 (Exhibit 4F, page 2). Records during the period specifically notes on August 27, 2013, showed reports of recurrent "migraines" with a[n] unremarkable brain imaging (Exhibit 4F, page 1). Despite these symptoms, [Plaintiff] was working as a teacher's aide, had

been able to continue working, as well as reported exercising regularly (Exhibit 4F, page 1). Physical examination noted pain when putting weight on the ball of her right foot, excellent range of motion in the lumbar spine, some tenderness in the coccyx, no motor weakness, sensory loss, or reflex changes, tenderness over the head of the metatarsals on the right and diffuse tenderness throughout the right wrist (Exhibit 4F, page 1). [Plaintiff] was advised to see a podiatrist for her foot pain, and was ordered to undergo EMG and nerve conduction studies to rule out the possibility of carpal tunnel syndrome, tarsal tunnel syndrome, and radiculopathy (Exhibit 4F, page 1). On September 16, 2013, [Plaintiff] underwent EMG and nerve conduction studies of the right upper and lower extremities and corresponding paravertebral regions with normal findings (Exhibit 4F, pages 3–4).

Pain clinic notes in October 2013, showed [Plaintiff] reported doing "quite well" with her current chronic pain regimen, despite developing acute pain in her right foot associated with "Zumba and kickboxing" (Exhibit 6F, page 4). Physical examination noted mild dysthesia over the middle and ring fingers of the right hand to light palpation, slightly decreased hand grasps, normal range of motion of the wrist, tenderness along the second metatarsal of the right foot at the head and cuneiform bones laterally to the fifth metatarsal, mild hyperesthesia to the dorsal aspect of the foot, and slightly decreased ankle range of motion due to pain (Exhibit 6F, page 4). Pain medication was ordered including Percocet and Naprosyn, with ordered to follow up with an orthopedist for her foot and hand pain (Exhibit 6F, page 4).

Pain management notes on January 14, 2014, showed increase in pain in the context of doing "impact exercising" and indicated that she continued to work part time, and smoke cigarettes against medical advice (Exhibit 7F, page 1). Physical examination noted an unspecified number of tender points in all 4 quadrants, with continued medication management advised (Exhibit 7F, page 1).

In December 2014, [Plaintiff] established with a new provider for evaluation and treatment of chronic pain (Exhibit 12F, page 25). [Plaintiff] reported a history of Methadone treatment with significant improvement in her pain, and indicated that she does yoga in the morning, despite her symptoms (Exhibit 12F, page 25). Physical examination noted normal range of motion in the cervical and lumbar spine, normal range of motion in the hands, and positive tender points for fibromyalgia (Exhibit 12F, page 26). Urinary drug screen was positive for cannabinoids and opiates, with continued Methadone ordered (Exhibit 12F, page 26). On December 22, 2014, [Plaintiff] explained that her abnormal urinary drug screen was the result of her daughter who gave her mother a piece of birthday cake that had marijuana, as a joke (Exhibit 12F, page 22).

(Tr. 23–24).

The ALJ went on to summarize Plaintiff's physical symptoms during 2015 and 2016:

Pain management notes in March and June 2015, showed continued medication management for Methadone, with [Plaintiff] indicating that she continued to engage in some exercise despite physical symptoms (Exhibit 12F, pages 16–20). In September 2015, [Plaintiff] reported that she continued to have fibromyalgia and headache pain exacerbated by family stressors, which included raising their grandchild and continued problems with her daughter (Exhibit 12F, page 13). [Plaintiff] endorsed being able to perform her activities of daily living with medication, and continuing to exercise at her gym (Exhibit 12F, page 14). Physical examination was notable for positive fibromyalgia tender points, with continued medication management for pain ordered (Exhibit 12F, pages 14–15). In December 2015, [Plaintiff] reported that she is no longer working but not related to her pain symptoms, and wanted to speak with her doctor regarding disability criteria (Exhibit 12F, page 9). Continued medication management was advised with a follow up scheduled to discuss disability criteria (Exhibit 12F, page 11).

Neurology notes on April 21, 2016, showed reports of constant headaches, with a history of unremarkable imaging studies (Exhibit 10F, page 1). Examination noted [Plaintiff] had 18/18 fibromyalgia trigger points, venous pulsations present in the optic fundi, which ruled out increased intracranial pressure, and an otherwise normal neurologic examination (Exhibit 10F, page 2). [Plaintiff] was recommended to undergo evaluation for Botox treatment through pain management due to what appeared to be pharmaco-resistant headaches which had not responded to the standard headache medications (Exhibit 10F, page 2).

On May 11, 2016, [Plaintiff] underwent evaluation for Botox therapy, reporting daily headaches lasting between 3–5 hours and exacerbated by movements or stress (Exhibit 13F, page 4). Physical examination noted tenderness in the bilateral trapezius and cerebrospinal muscle, with good active range of motion in the upper extremities and 5/5 muscle strength throughout (Exhibit 13F, pages 5–6). [Plaintiff] was found to be a good candidate for Botox injection and was ordered for injections pending insurance approval (Exhibit 13F, page 7). [Plaintiff] underwent her first injection on June 29, 2016 (Exhibit 13F, pages 8–12).

Pain management notes in July 2016, showed increase in stress associated with some domestic disharmony, continued fibromyalgia pain, and 70% relief in pain with Methadone, Lyrica, and Botox treatments (Exhibit 18F, pages 4–5). With [Plaintiff]'s current medication regimen, [Plaintiff] indicated she was able to shop, drive, interact with people, and perform housework (Exhibit 18F, page 5). Continued medication management was advised with refills provided (Exhibit 18F, page 5).

On August 3, 2016, [Plaintiff] reported to pain management for follow up of her Botox therapy, estimating a 75% decrease in headache frequency and severity since her injection (Exhibit 17F, page 68). Neurological examination was unremarkable with no cranial nerve deficit noted and normal coordination (Exhibit 17F, page 71). Repeat injection was ordered 91 days from her initial injection on June 29, 2016

(Exhibit 17F, page 71). On September 28, 2016, [Plaintiff] underwent a Botox injection to treat her chronic migraines reporting about 50% improvement in her headaches with decreased headache episodes frequency after the initial treatment (Exhibit 17F, page 77). Pain management notes on October 24, 2016, indicated [Plaintiff] had recently catered her son's wedding, but had some conflicts at the wedding, and reported emotional triggering of her headache despite Botox treatment for migraines (Exhibit 18F, page 1). Continued medication management was advised, with aerobic activity and daily stretching to help with fibromyalgia symptoms (Exhibit 18F, page 2).

Pain management notes on December 30, 2016, showed [Plaintiff] received her third Botox injection for chronic migraine symptoms, with reported significant improvement and no major headaches episodes from her last injection in September 2016 through a week and a half prior to this visit (Exhibit 20F, page 7). On January 24, 2017, [Plaintiff] was seen for follow up of her pain, with [Plaintiff] continuing to report that her medication allowed the performance of activities of daily living (Exhibit 22F, pages 16–17). [Plaintiff]'s Methadone was refilled, with Reglan initiated to be taken at the onset of migraines, and Lyrica discontinued (Exhibit 22F, page 17). Follow up on March 23, 2017, showed [Plaintiff] tried to wean off Lyrica but noted increased pain so restarted the medication, with continued Methadone ordered (Exhibit 22F, pages 13–14). The pain management note showed that with medication, [Plaintiff] was able to perform self-care including bathing, dressing, eating, using the restroom by herself, shopping, driving, and interacting with people (Exhibit 22F, page 14).

(Tr. 24–26).

Next, the ALJ summarized Plaintiff's treatment history from 2017–2019:

[Plaintiff]'s date last insured for the purpose of her Hospital Insurance Benefits (Medicare Part A) claim expired on March 31, 2017.

Records thereafter showed continued Botox injections with significant decrease in her headache frequency and severity and no side effects with the injection (Exhibits 20F, pages 9–15; 26F). [Plaintiff] continued to be followed for her Methadone medication, with notes in July 2017 that she was planning to take her grandchild to Dollywood later in the month (Exhibit 22F, pages 7–12). On July 10, 2017, [Plaintiff] was diagnosed with pneumonia after reportedly being exposed to fumes while she was renovating an apartment (Exhibit 24F, page 4). On September 26, 2017, [Plaintiff] underwent a sleep study, which showed findings of obstructive sleep apnea (Exhibit 21F, pages 60–61). In November 2017, [Plaintiff] expressed concern regarding Lyrica as she had done well with the medication but could not afford it if insurance did not pay and discussed the possibility of weaning off the medication (Exhibit 22F, page 2).

5

> Pain management notes in May 2018 noted [Plaintiff] was under Botox treatment for migraines but this was too expensive to continue, and continued Methadone ordered for pain (Exhibit 34F, pages 1–2). In September 2018, [Plaintiff] reported starting to wean off Methadone due to its limited effect and unspecified side effects (Exhibit 33F, page 5). Notes in November 2018 showed [Plaintiff] continued to care for her 11 year old autistic grandchild two days per week and weekends and a newborn grandchild three days per week (Exhibit 32F, page 45). On November 19, 2018, [Plaintiff] notified her pain management provider that she wanted to move forward with a marijuana card (Exhibit 34F, page 17). Notes on January 17, 2019, showed [Plaintiff]'s husband was working out of their home managing their properties (Exhibit 34F, page 21). Pain management follow up on March 14, 2019, showed [Plaintiff] obtained a medical marijuana card and that she used it 4–5 times per day, with reduced pain, but endorsed "fibro fog" and short term memory problems (Exhibit 34F, page 25).

(Tr. 26).

The ALJ then turned to Plaintiff's mental health history, beginning with treatment records from 2014–2015:

> Turning to [Plaintiff]'s alleged mental impairments, the record shows a history of depression and anxiety, exacerbated by her father [sic] health and stress, and treated with medications (Exhibit 9F, pages 15–17).
>
> On April 22, 2014, [Plaintiff] underwent an initial psychiatric evaluation for alleged depression and anxiety symptoms in the context of bereavement for her father and issues with her "uncontrollable" teenage daughter (Exhibit 8F, page 18). She reported also provided [sic] care for her step grandson who is eight and autistic (Exhibit 8F, page 18). [Plaintiff] also reported currently working for Tri-Valley School System in the kitchen and that she loved her job (Exhibit 8F, page 19). Mental status examination noted [Plaintiff] was well groomed and dressed casually, had regular speech in rate and volume, was coherent but sometimes rambling and tangential, had a depressed mood and restricted affect, was tearful during her visit, had coherent thought process, intact short and long term memory, and fair insight and judgement (Exhibit 8F, page 19). [Plaintiff] was diagnosed with major depressive disorder, anxiety disorder, rule out personality disorder, and a global assessment of functioning (GAF) score of 50 (Exhibit 8F, page 20). [Plaintiff] was ordered to continue Wellbutrin and Cymbalta, discontinue Xanax, and start trials of Lorazepam and Risperdal (Exhibit 8F, page 20).
>
> Medication management follow up in July 2014, revealed a mental status examination which showed normal eye contact, cooperative attitude/behavior, normal speech, neutral mood with an appropriate affect, coherent thought processes, average intellect, intact short and long term memory/concentration, and

6

fair insight/judgement (Exhibit 8F, pages 11–12). Continued medication management was advised with a regimen including: Xanax, Abilify, Wellbutrin, Cymbalta, and Levomilnacipran (Exhibit 8F, page 13). Follow up in August 2014, noted [Plaintiff] did not want to be on Xanax anymore due to concerns about potential for addiction, and reports that her daughter remained her biggest stressor (Exhibit 8F, page 8). She endorsed that irritability and anger issues had reduced since starting Abilify (Exhibit 8F, page 8). Mental status examination was generally unchanged although a labile mood and mood congruent affect was noted (Exhibit 8F, page 9). Continued medication management was advised with Xanax discontinued (Exhibit 8F, page 10). In September 2014, [Plaintiff] reported doing well and having quit taking Cymbalta with noticeably improved moods, but complained of poor concentration, memory, and focus (Exhibit 8F, page 5). Mental status examination was generally unremarkable although tangential thought processes and distracted and inattentive memory/concentration was noted (Exhibit 8F, page 6).

Medication management notes in November 2014, showed [Plaintiff] reporting doing much better on her current regimen, was no longer depressed or anxious, but did endorsed tearfulness at times (Exhibit 8F, page 2). Continued medication management with Depakote, Fetzima, Abilify, Topamax, and Wellbutrin was advised (Exhibit 8F, page 14).

In March 2015, [Plaintiff] reported increased anxiety and depressive symptoms including decreased concentration, depressed mood, excessive worry, insomnia and nervous/anxious behavior aggravated by her husband losing his job (Exhibit 9F, page 8). Examination noted [Plaintiff] was agitated, exhibited a depressed and tearful mood, but did not have rapid and/or pressured speech (Exhibit 9F, page 8). Situational anxiety and depressive disorder [were] diagnosed and Zoloft was prescribed (Exhibit 9F, page 8). Follow up in May 2015, noted [Plaintiff]'s depression was gradually improving with Zoloft, with continued medication management advised (Exhibit 9F, page 6).

(Tr. 26–27).

Finally, the ALJ summarized Plaintiff's mental health treatment from 2016–2019:

On February 23, 2016, [Plaintiff] established with a new provider alleging anxiety and depression, which has been worsening in the context of multiple stressors including inability to work, raising an autistic grandson, struggling with family issues and multiple losses (Exhibit 14F, page 1). Mental status examination noted a depressed and anxious mood and affect, reports of anxiety with panic attacks, being sad and tearful all the time, with no impairment in judgment, insight, and memory (Exhibit 14F, pages 4–5). Additional evaluation for medication management and counseling services was advised (Exhibit 14F, pages 7–8). Counseling notes in March 2016, showed [Plaintiff] reporting an addition [sic] to shopping and that she had been able to go to the gym and work out, with cognitive

behavioral therapy provided to improve stress coping skills and the ability to deal with anxiety (Exhibit 19F, page 3). In April 2016, [Plaintiff] was prescribed Clonazepam, Latuda, and Setraline for her mental health symptoms (Exhibit 14F, pages 9–18). In May 2016, Risperidone and Lamotrigine were added to [Plaintiff]'s regimen (Exhibit 14F, page 26). Follow up in June 2016, noted modest improvement with medication, but continued anxious and dysphoric symptoms (Exhibit 14F, pages 29–30). Psychiatric examination noted regular speech, thought processes characterized by flight of ideas, intact judgment and insight, and a depressed/sad mood and affect (Exhibit 14F, pages 34–35). Continued medication management was advised (Exhibit 14F, pages 35–36). Notes in July 2016, showed the medication continued to help [Plaintiff] function better, but struggling with the situation with her autistic grandson and considering a group home placement for him (Exhibit 14F, page 40). Counseling notes on July 27, 2016, showed reports of concerns regarding the relationship between her husband and [Plaintiff], as well as struggling with the diagnose [sic] for her grandson (Exhibit 19F, page 17).

Medication management notes in September 2016, showed a psychiatric examination revealing regular speech, clear and linear thought processes, intact judgment and insight, and appropriate mood and affect (Exhibit 19F, pages 32–33). Continued medication management including Lamotrigine, Sertraline, and Clonazepam was ordered (Exhibit 19F, pages 33–34).

Counseling notes in November 2016, showed [Plaintiff] reporting being in fun or manic period but upset due to financial concerns (Exhibit 25F, page 1). Supportive psychotherapy was provided (Exhibit 25F, pages 1–2). In December 2016, [Plaintiff] stated she was ok but struggling with her sister and finally "had it out with her sister" (Exhibit 25F, page 3). Medication management notes in January 2017, noted improved moods, less severe and frequent panic symptoms, but continued depression and crying spells (Exhibit 25F, pages 21–22). Psychiatric evaluation noted regular speech, clear and linear thought processes, intact judgment and insight, and a depressed/sad and blunted mood and affect (Exhibit 25F, pages 26–27). Continued medication management was advised (Exhibit 25F, pages 27–28). Follow up on March 17, 2017, noted an essentially unchanged mental status examination and continued medication management advised (Exhibit 25F, pages 31–36).

[Plaintiff]'s date last insured for the purpose of her Hospital Insurance Benefits (Medicare Part A) claim expired on March 31, 2017.

Records thereafter showed continued individual psychotherapy to assist with developing coping skills and dealing with stressors (Exhibit 25F, pages 5–10). Pharmacological notes showed [Plaintiff] taking her medications with benefits, but increased symptoms in the context of increased familial stressors (Exhibit 25F, page 42–80). In a medication management note dated April 10, 2018, Roger Balogh, M.D., indicated [Plaintiff] remains very unstable, is unable to maintain

function and stability to be able to work in any employment and is totally disabled (Exhibit 31F, pages 7–8). [ ]

In November 2018, [Plaintiff] reported a desire to work with her doctor on approving medical marijuana to treat panic and anxiety (Exhibit 33F, page 14). In December 2018, [Plaintiff] reported increase in anxiety symptoms due to relationship issues with her husband, noting they had discussed divorce (Exhibit 33F, page 33). In January 2019, [Plaintiff] notified her mental health provider that she will be going on "medical marijuana" and that she had already taken herself off Methadone in preparation (Exhibit 33F, page 46). In May 2019, [Plaintiff] reported increase in anxiety symptoms due to her husband's diagnosis of stage 4 stomach cancer (Exhibit 33F, page 53).

(Tr. 27–29).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through June 30, 2015, and last met the insured status requirements for Medicare Qualified Government Employee (MQGE) benefits through March 31, 2017. (Tr. 19). She had not engaged in substantial gainful employment during the period from her alleged onset date of January 1, 2013, through her date last insured of March 31, 2017. (*Id.*). The ALJ determined that, through the date last insured, Plaintiff had the following severe impairments: fibromyalgia, headache disorder, depressive disorder, and anxiety disorder. (Tr. 20). Still, the ALJ found that, through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record, [the ALJ] finds that, through the date last insured, [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: [Plaintiff] would need a sit/stand option of every hour for 2 to 5 minutes while on task; can tolerate occasional climbing of ramps and stairs; frequent balancing, stooping, and kneeling; occasional crouching and crawling; should avoid climbing ladders, ropes, or scaffolds, and exposure to hazards such as moving machinery, heavy machinery, or unprotected heights. [Plaintiff] is expected to be off task up to 20 minutes per day, spread throughout the course of the day, due to issues with anxiety. [Plaintiff]

9

would perform best in a position with no more than occasional changes and decision making so as to provide for low stress.

(Tr. 22).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 29).

The ALJ then turned to the opinion evidence, beginning with the opinion of the state agency medical consultant:

> . . . [T]he undersigned has considered the State agency medical consultant assessment, who initially indicated [Plaintiff] could perform a reduced range of medium exertion work, with frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, or scaffolds, frequent balancing, stooping, and kneeling, and occasional crouching and crawling (Exhibit 1A). At reconsideration, the State agency medical consultant generally affirmed the reduced range of medium exertion work, but further limited [Plaintiff] to no climbing of ladders, ropes, or scaffolds, and avoiding all exposure to hazards (Exhibit 3A). The undersigned has assigned these opinions some weight. However, giving some deference to [Plaintiff]'s subjective reports and additional evidence submitted after their respective reviews, the undersigned has further reduced [Plaintiff]'s residual functional capacity to the light level of exertion with additional limitations as noted above. Postural activity limits and a sit/stand option have been provided to address [Plaintiff]'s joint pain associated with her fibromyalgia, and environmental limitations assessed to account for her headache disorder.

(Tr. 30).

Next, the ALJ considered a September 16, 2013, opinion from treating neurologist Dr. Robert Thompson, who was unable to find any evidence of serious neuropathology causing Plaintiff's present symptoms. (*Id.*). The ALJ afforded this statement "some weight," explaining that Dr. Thompson is a treating source, and "the statement is generally consistent with the treatment evidence of record, which showed normal EMG and nerve conduction studies." (*Id.*).

The ALJ then considered a questionnaire prepared by Plaintiff's treating physician, Dr.

10

Nicholas Varrati, which set forth numerous physical and mental workplace limitations. (*Id*.). The ALJ afforded the opinion "little weight," explaining that Dr. Varrati provided no narrative explanation. The ALJ additionally discounted the opinion as being inconsistent with the record, including, for example, Plaintiff's "significant improvement in her fibromyalgic pain with Methadone, physical therapy, and working out[.]" (*Id*.).

Relying on the VE's testimony, the ALJ concluded that, through the date last insured, Plaintiff was unable to perform her past relevant work as a daycare provider or office manager, but could perform jobs that exist in significant numbers in the national economy, such as a marker, produce weigher, or office cleaner. (Tr. 31–33). The ALJ therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from January 1, 2013, the alleged onset date, through March 31, 2017, the date last insured (20 CFR 404.1520(g))." (Tr. 33).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538

(6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts that the ALJ failed to provide good reasons for discounting the May 2018 opinion of her treating physician, Dr. Varrati. (*See generally* Doc. 16 at 9–15). More specifically, she contends that the ALJ's discussion of Dr. Varrati's opinion reflects a misunderstanding of fibromyalgia. (*See id.*).

Two related rules govern how the ALJ was required to analyze a treating physician's opinion: the treating physician rule and the good reasons rule. *Dixon v. Comm'r of Soc. Sec.*, No. 14-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[1] The treating physician rule requires an ALJ to give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). The good reasons rule requires the ALJ to always give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (alterations in original) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); 20 C.F.R. § 404.1527(c)(2)). At base, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the

---

[1] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016). But because Plaintiff filed her claim before the effective date, the new rules do not apply.

weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Paramount is whether ". . . the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

On May 29, 2018, Dr. Varrati completed a medical source statement regarding Plaintiff's functional limitations. (Tr. 1149–51). Dr. Varrati noted Plaintiff's fibromyalgia and mental health diagnoses and opined that: She can stand/walk and sit for less than two hours total in an eight-hour workday with normal breaks; would need a job that would permit shifting positions at will from sitting, standing, or walking; and would need unscheduled breaks every 45 minutes for 15–20 minutes per break, during which she could lie down or sit quietly. (Tr. 1149–50). Dr. Varrati also opined that: Plaintiff would likely be off task at least 25% percent of a typical workday; is incapable of even "low stress" work; would have good and bad days; and would likely miss work more than four days per month due to her various impairments or treatment. (Tr. 1150–51).

The ALJ afforded Dr. Varrati's opinion "little" weight for three primary reasons. (Tr. 30). To start, she explained that "Dr. Varrati provided no substantive explanations to support his assessed limitations, nor cites any specific objective evidence for the same." (*Id*.). Additionally, the ALJ found that "Dr. Varrati's own treatment notes fail to support such significant physical limitations or restrictions, particularly for instance, treatment notes in which he noted [Plaintiff's] significant improvement in her fibromyalgic pain with Methadone, physical therapy, and working out on June 9, 2015 (Exhibit 12F, pages 16–17)." (*Id*.). Finally, the ALJ reasoned that "Dr. Varrati's opinion that [Plaintiff] would be absent more than four days a month due to her impairments is similarly not supported in the evidence." (*Id*.).

Plaintiff asserts that the record supports Dr. Varrati's opinion. (*See generally* Doc. 16 at

13

11–14). She also contends that the ALJ's treatment of Dr. Varrati's opinion reflects a misunderstanding of fibromyalgia. (*See generally id*. at 11–16). The Undersigned addresses each argument.

### A. Record Support

As noted, the ALJ found that Dr. Varrati failed to provide narrative or objective support for his opinion. (Tr. 30). Plaintiff responds that Dr. Varrati was not required to cite or explain all of the evidence supporting his opinion. (Doc. 16 at 11–14). That is true. Dr. Varrati was not required to list every supportive document or thoroughly explain his reasoning. Yet, as Defendant notes (Doc. 17 at 5–6), questionnaire forms like Dr. Varrati's, "that [] consist[] entirely of check box answers, and are unaccompanied by an explanation, even though space was provided for that purpose[,] . . . are 'weak evidence at best.'" *Schaub v. Comm'r of Soc. Sec.*, No. 1:16-CV-80, 2016 WL 6122602, at *6 (W.D. Mich. Oct. 20, 2016) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)); *see also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) ("We have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation."). Because Dr. Varrati failed to provide any narrative or documentary support in his check box opinion, it is "'weak evidence at best'" to support the extreme ways in which he claims Plaintiff is limited. *See Schaub*, 2016 WL 6122602, at *6 (quoting *Shalala*, 994 F.2d at 1065). Accordingly, the ALJ did not err in discounting Dr. Varrati's opinion on this basis.

Next, Plaintiff challenges the ALJ's opinion by relying on "a plethora of treatment records documenting [her] fibromyalgia." (Doc. 16 at 14). These records include Dr. Varrati's treatment notes documenting Plaintiff's chronic pain and mental health problems, as well as her migraines and difficulty sleeping. (*Id*. at 11–14). The ALJ considered the evidence upon which Plaintiff

relies and found it did not support further RFC limitations. *See* Tr. 29 (explaining why Plaintiff's alleged physical and mental health symptoms "are not entirely consistent with medical evidence and other evidence in the record"). This was especially so because Dr. Varrati elsewhere noted Plaintiff's significant improvement. (Tr. 30 (citing Exhibit 12F, pages 16–17)).

At base, Plaintiff wishes "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017). But the law prohibits the Court from reweighing the evidence and substituting its judgment for that of the ALJ. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.")). In sum, Plaintiff has not shown that the ALJ erred when she reviewed the record vis-à-vis Dr. Varrati's opinion.

**B. Fibromyalgia**

Plaintiff also contends, more broadly, that the ALJ's opinion reflects the ALJ's misunderstanding of how fibromyalgia impacts an individual's ability to work. (*See generally* Doc. 16 at 11–16). Plaintiff cites numerous treatment notes wherein Dr. Varrati, among others, could not identify objective findings that would explain her chronic pain. (*Id*. at 11–14). This lack of objective findings, says Plaintiff, is typical for fibromyalgia patients. (*See generally id*.). Thus, says Plaintiff, the ALJ erred by discounting Dr. Varrati's opinion for a lack of evidence. (*See id*.).

Plaintiff is correct that fibromyalgia "is an unusual impairment in that its symptoms are often not supportable by objective medical evidence.'" *Montgomery v. Comm'r of Soc. Sec.*, No.

15

2:19-CV-01618, 2020 WL 1846749, at *10 (S.D. Ohio Apr. 13, 2020), *report and recommendation adopted*, No. 2:19-CV-1618, 2020 WL 5545671 (S.D. Ohio Sept. 16, 2020) (quoting *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008)). This means that "an ALJ might arguably err if she discounts a treating physician's opinion about a fibromyalgia patient solely because that opinion is not supported by objective medical evidence." *Montgomery*, 2020 WL 1846749, at *10.

That is not what happened here. To begin, the ALJ found that Dr. Varrati's opinion that Plaintiff would miss more than four days of work per month lacked supporting evidence in the record. It is not clear whether that proposed limitation stems from Plaintiff's mental health impairments, fibromyalgia, or both. In any event, the ALJ found Dr. Varrati's opinion lacking in several other ways. As discussed, she discounted Dr. Varrati's opinion because it lacked substantive support. (Tr. 30).

On top of that, the ALJ found that Dr. Varrati's own treatment notes, including, for example, that Plaintiff reported significant improvement with fibromyalgia pain with medication, physical therapy, and working out, were inconsistent with the doctor's own extreme proposed limitations. (*Id.*). The ALJ properly considered these inconsistencies. Indeed, "[w]hen objective medical evidence does not confirm the severity of a claimant's pain," the Commissioner must fill the gaps. *Blair v. Comm'r of Soc. Sec.*, 430 F. App'x 426, 430 (6th Cir. 2011). To do so, the Commissioner must consider: "[A] claimant's daily activities; location, duration, frequency, and intensity of the pain or other symptoms; precipitating or aggravating factors; any medication treatment, or measures used to relieve pain or other symptoms; and other functional limitations or restrictions due to pain or other symptoms." *Id.* (citing 20 C.F.R. §§ 404.1529(c)(3), 416.927(c)(3)).

That is precisely what the ALJ did. When summarizing the evidence, she considered numerous discrepancies between Plaintiff's reported pain and mental health problems and her activities of daily life and reported improvements with medication and therapy. (*See, e.g.*, (Tr. 23 (citing Tr. 5691) ("Despite these symptoms, [Plaintiff] was working as a teacher's aide, had been able to continue working, as well as reported exercising regularly."); Tr. 24 (citing Tr. 581) ("Pain clinic notes in October 2013, showed [Plaintiff] reported dong 'quite well' with her current chronic pain regimen, despite developing acute pain in her right foot associated with 'Zumba and kickboxing.'"); *id*. (citing Tr. 663–67) ("Pain management notes in March and June 2015, showed continued medication management for Methadone, with [Plaintiff] indicating that she continued to engage in some exercise despite physical symptoms."); *id*. (citing Tr. 661) (noting that, during a September 2015 appointment, Plaintiff "endorsed being able to perform her activities of daily living with medication, and continuing to exercise at her gym"); Tr. 25 (citing Tr. 894–95) ("Pain management notes in July 2016, showed increased [sic] in stress associated with some domestic disharmony, continued fibromyalgia pain, and 70% relief in pain with Methadone, Lyrica, and Botox treatments."); *id*. (citing Tr. 895) ("With [Plaintiff's] current medication regimen, [Plaintiff] indicated she was able to shop, drive, interact with people, and perform housework."); *id*. (citing Tr. 1024–25) ("On January 24, 2017, [Plaintiff] was seen for follow up of her pain, with [Plaintiff] continuing to report that her medication allowed the performance of activities of daily living."); Tr. 26 (citing Tr. 656) ("Notes in November 2018 showed [Plaintiff] continued to care for her 11 year old autistic grandchild two days per week and weekends and a newborn grandchild three days per week."); Tr. 29 ("Furthermore, the undersigned notes that [Plaintiff] worked during the period at issue and by her own reports reported that she is no longer working but not related to her pain symptoms"); *id*. ("Despite [Plaintiff's] subjective reports of mental health related symptomology,

17

[Plaintiff] was able to maintain independence with her activities of daily living including personal hygiene, interacting with her family, providing direct care for her special needs grandchild, in addition to driving, shopping, and cleaning her home.")).

In sum, while "an ALJ might arguably err if she discounts a treating physician's opinion about a fibromyalgia patient solely because that opinion is not supported by objective medical evidence," the ALJ did not do so here. *Montgomery*, 2020 WL 1846749, at *10 (internal quotation marks and citations omitted) (finding that ALJ did not improperly discount treating physician's opinion regarding plaintiff's fibromyalgia where ALJ also noted plaintiff's "significant activities of daily living, including work activity and caring for his children," in addition to "summariz[ing] [p]laintiff's activities of daily living elsewhere in her determination").

Instead, the ALJ properly considered, in addition to lack of record support, Dr. Varrati's failure to explain his opined limitations, as well as Plaintiff's improvements with medications and therapy, and Plaintiff's activities of daily living. *See, e.g.*, *id*. ("In this case, however, the ALJ did not exclusively rely on a lack of objective findings. Rather, the ALJ also discounted [treating physician's] opinion because it was inconsistent with [p]laintiff's daily activities."); *Schaub*, 2016 WL 6122602, at *6 (upholding ALJ's decision discounting treating physicians' opinions where "the ALJ found the doctors' opinions to be inconsistent with [p]laintiff's admissions in the record," including that "[p]laintiff stated her [fibromyalgia] symptoms were well controlled with medication," and "[t]he ALJ also found the severity of limitations to be inconsistent with [p]laintiff's activities"). Thus, the ALJ did not err, and remand is not warranted.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: June 3, 2021             /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE